[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action to dissolve the marriage of the parties on the ground of irretrievable breakdown. Each party was represented by legal counsel. They presented evidence October 11, October 22, December 20, and December 21, 2001, and February 25, 2002.
The more credible evidence leads to the following factual findings. The plaintiff, whose maiden name was Nancy Greenberg, and whose name at the time of the marriage was Nancy Moran, and the defendant married July 25, 1993 in Cromwell, Connecticut. They have resided in the State of Connecticut continuously for more than one year next before the date of the complaint. There are no minor children issue of the marriage. Neither party has received financial support during the marriage from the State of Connecticut or any municipality thereof. The marriage of the parties has broken down irretrievably. CT Page 3293
The plaintiff wife is 39 years old and has a high school education. In 1981 she received a medical assistant certificate, but she was unable to secure work in that field. During the marriage she assisted at her husband's business, Aresco Superette, as bookkeeper and part-time clerk until 1998. According to the defendant, his wife never drew a salary at the store. In his words: "She just helped out." The result was the plaintiff's financial dependence upon the defendant. In June, 2001, the plaintiff received training as a certified optic technician. She is seeking employment in fiber optics. In the meantime, she has worked some office temp jobs.
The plaintiff has three children by a previous marriage. Her 17-year-old son continues to live with the plaintiff. Her eldest child is now in college. The youngest child does not reside with the plaintiff. The plaintiff receives child support from her first marriage in the amount of $254.50 per week. She is receiving $75 per week alimony pendente lite from the defendant in this matter, plus $20 per week towards her car insurance. She has no other income.
In 1997, the plaintiff was evaluated at the Elmcrest hospital for anxiety and depression. About a year and a half later, at the time of a medication change, she was once again hospitalized for anxiety and depression. She continues in therapy or counseling for anxiety and depression at a cost of $114 per month. Her mental and physical health probably has not been helped by her regular use of marijuana. The court does not find credible the plaintiff's claim that she no longer uses marijuana. The plaintiff also suffered a back injury in 2000, and continues to have back problems.
The defendant is 49 years old and has a high school education. He is the sole owner of a small grocery and convenience market called Aresco Superette, located in a residential district in the eastern part of Meriden. It had been the business of the defendant's father, who died in 1982. The defendant has worked in the store continuously since 1965, when he was a child. The business is incorporated. Five or six years ago, the defendant's mother gifted to him, free of encumbrances, the land and improvements where the store is situated. The defendant employs a cashier at the store. Also, two of the defendant's three adult sons from a first marriage work for him at the store.
The defendant has arthritis in both knees. Possibly he is a candidate for knee replacement surgeries in the future. He is overweight, but has lost 50 pounds and is still working on weight loss.
For many years, the defendant took a draw of $445 per week from his business. On March 26, 2001, he began taking out $365 per week. In CT Page 3294 addition to the draw, the defendant put aside $400 per month into a mutual fund savings account and took in-kind goods, such as food, from the Superette for daily living needs. Until early 2000, the business also paid $700 per month rent to the defendant individually. The parties' income tax returns show income for many years in the low $30's. It is evident from the $150,000-per-year lifestyle maintained by the parties throughout their marriage until 2000, that the defendant derived substantial additional cash income beyond the weekly draw from the store. The defendant's personal bank account statements for the years 1997, and 1998, show deposits each month ranging from $3,000 to $18,000. There were no corresponding withdrawals from his Washington Mutual savings fund. The defendant was unable or unwilling to account for the source of these monies under cross-examination. The defendant had no explanation for the use of a check written to himself from the joint First Union checking account on February 7, 2000, in the amount of $33,000. He did not deny that he has engaged in some bookmaking over the years.
Since November, 1999, when a Super Stop Shop opened down the street from the Superette, the defendant's custom has decreased by 30%; it continues to decline. The defendant can buy goods at retail at the Stop Shop for less than he can buy them at wholesale for his store. The business grossed over $1,000,000 in 1996, but was down to a gross of $800,000 in 2000. The long-term prognosis for the survival of the market is poor. Although the defendant's income has diminished considerably since November 1999, the parties have seemingly been unable to adjust their spending habits accordingly.
The parties both enjoy gambling as a pastime. When the parties lived together, the plaintiff visited casinos two or three times per week in addition to her local Monday night bingo. Since the defendant moved out of the marital residence March 23, 2001, the plaintiff's visits to casinos have become infrequent. The defendant has continued to go to the Mohegan Sun casino since the separation. In October, 2001, he testified that he had been there a dozen times so far that year. He had also been to Atlantic City in the year 2001.
During the marriage, the parties made an annual Christmastime visit to Las Vegas. The plaintiff plays bingo and the slots at casinos; the defendant plays poker and table games. Occasionally the parties went together to the casinos. They stayed overnight at the casinos about half the time, whether on trips together or on separate trips.
Each of the parties vehemently blames the other for the break-up of the marriage. The plaintiff claims that the defendant has a violent and volatile temper. Prior to June, 1998, when the defendant was arrested for CT Page 3295 assault, he had a temper tantrum every six to eight weeks, ranting and breaking things in the house, such as lamps and remote controls. He would accuse the plaintiff groundlessly of having love affairs with others. Since his participation in an anger management program in 1998, the defendant utilizes techniques such as T-ball batting or playing video games to cool off. Each party has called the police on occasion since 1998. At the time of the defendant's move-out on March 23, 2001, it was the plaintiff who smashed the clock on the mantel.
Since he moved out of the house, the defendant has been venting his anger at the plaintiff by playing games with the court-ordered alimony and car insurance checks, by harassing e-mails and telephone calls, by following the plaintiff, and, most notably to the court, by taunting facial expressions and gestures towards the plaintiff in the courtroom when the defendant thought the plaintiff was looking at him and thought the judge was not looking at him.
The plaintiff has asserted that the defendant used control of the family finances to dominate her. Prior to June, 1998, the defendant generously paid all the plaintiff's bills and gave her money for all her expenditures. Beginning in June, 1998, he refused to give her any money whatsoever, telling her that he would pay all the shelter, food and insurance expenses while she could use her child support money for her personal needs. He also suggested she get a job. When he moved out of the house in March, 2001, the defendant emptied the joint bank accounts. However, he did not draw out the remaining equity in the line of credit on the house, and he had no control over the plaintiff's credit card expenditures.
The defendant asserts that the plaintiff would smoke marijuana upstairs in the bedroom. He wanted her to stop. However, for a while he joined her in smoking; he even supplied the marijuana for some time. Eventually he insisted that she quit. In 1998, the plaintiff promised to stop smoking marijuana, but she did not do so. The defendant cites this as one of the reasons he stopped providing cash to his wife and stopped paying her credit card debt. The other reason was his recognition that his business revenues were declining even before the advent of the Super Stop Shop in the neighborhood.
The defendant claims that the plaintiff is a spendthrift. He alleges that her gambling losses were more than the parties could afford. Also, she took numerous trips within the United States with her friends and relatives, putting all her expenses on credit cards. The defendant asserts that more than two-thirds of the $65,000 home equity loan on the marital residence at the time of its sale was attributable solely to the plaintiff's extravagances. The plaintiff says that her gambling losses CT Page 3296 were modest. At least one trip, to Aruba in 1998, included not only the plaintiff's daughter, but also the defendant himself. The plaintiff says that such expenditures as Christmas gifts, trips, a computer purchase, a new couch, and recent attorney fees and household expenses were reasonable and necessary.
The plaintiff asserts that the defendant was the big spender in the family. He took vacations to the Carolinas without the plaintiff. He lavished large sums of money on his own adult children. His son was hospitalized with psychiatric problems three times between 1997, and 1998. The defendant paid all his son's bills. In November, 1999, the defendant's first wife sold a house in which the defendant retained an interest. He gave all of his $48,000 net proceeds to his sons.
The parties both recognized in 1996, and in 1997, that their marriage was deteriorating. They sought marriage counseling. 1997 was the year of the plaintiff's hospitalization for anxiety and depression. In June, 1998, the defendant stopped paying the plaintiff's bills. After a violent blow-up resulted in the defendant's arrest, the plaintiff left the house for three days. She initiated a legal separation action. Thereafter, the parties reconciled. Although both parties contributed to the breakdown of the marriage, the court finds that the defendant's fault was greater than that of the plaintiff
The parties were not married until July, 1993. However, they purchased a house together in March, 1993. The purchase price was $180,000; the mortgage was $108,000. The plaintiff contributed $16,355.04 towards the equity. This sum was the net proceeds from the sale of her prior residence and was her only asset, aside from miscellaneous furniture, at the outset of this marriage. The defendant's mother made a gift of $13,000 towards the purchase. The defendant provided the balance of the equity from the sale of certain stocks, a winning lottery ticket, and a grocery co-op settlement check from a threatened lawsuit. All of these were assets owned by him prior to the marriage.
The defendant owned additional assets prior to the marriage as follows:
1. The business known as Aresco Superette
2. IBM stock, some of which was sold in 1999, to pay household bills
3. An American Skandia Xtra Credit annuity, which started in 1983, as a $5,000 gift from the defendant's mother
4. IRA's valued at $38,000 in 1993 CT Page 3297
5. American Skandia life insurance policy in the face amount of $10,000
6. The expectancy from the sale of the house from his first marriage
7. Miscellaneous furniture
The parties held the following assets and debts at the time of the dissolution of marriage trial:
A. Plaintiff's Assets
1. Liberty Bank checking account — negative balance
2. 1991 Cadillac DeVille and 1992 Buick Regal automobiles
3. 30 shares Disney stock — $571
4. Miscellaneous household furnishings
B. Defendant's Assets
 1. First Union checking account, opened January, 2002, with a gift from the defendant's mother — $8,000
2. Castle Bank checking account — $200
3. 130 shares IBM stock — $12,441
4. 25 shares Disney stock — $476
5. Washington Mutual Funds — $3,394
6. American Skandia life insurance policy — $12,000 cash value
7. IRA — $64,000, down from $69,920 as of July 20, 2001
8. American Skandia Xtra Credit annuity — $19,000
9. Aresco Superette business — inventory worth $45,000
 10. Real property at 238 Gravel Street, Meriden, the location of the Superette. The market value of $125,000 is reduced by a mortgage of $75,000 for a net current value of $50,000
11. 1992 Oldsmobile, 1997 Mitsubishi Galant, and 2000 Dodge Neon automobiles CT Page 3298
12. Miscellaneous household furnishings and collectibles
C. Joint Assets
1. 45 shares AOL — $1,449.45
2. Datek Online Brokerage Services account — $313
3. $4,686.38 remaining from the year 2000 tax refunds
4. $22,650.74 net proceeds from the sale of the marital residence
D. Plaintiff's Debts
1. Legal costs for this action — approximately $13,500
2. Chase credit card — $16,515
3. Am Ex credit card — $15,076
4. Bank of America credit card — $20,331
 5. Assorted utility, telephone, and house maintenance bills on the plaintiff's financial affidavit — $4,085
E. Defendant's Debts
1. Legal costs for this action — $11,630
F. Joint Debts
1. MBNA credit card — $9,143
The court has considered all the criteria in General Statutes §§46b-62, 46b-81 and 46b-82 in light of the evidence presented by testimony and exhibits. The following are the orders of the court:
1. The marriage of the parties is dissolved and they are each declared to be single and unmarried.
2. The defendant shall maintain medical insurance for the plaintiff at the sole expense of the defendant for 36 months from the date of the dissolution of the marriage. The medical insurance shall provide at least the same coverage and with the same medical providers, with no increased co-pay cost, as the plaintiff currently has through the CT Page 3299 medical insurance maintained by the defendant. At all times during the 36-month period, the defendant shall provide the plaintiff with an up-to-date medical insurance card. If the defendant is able to provide this comparable insurance through his current insurance provider using COBRA provisions, he may utilize that policy. If such insurance is not available for any reason or is not available for the full 36 months, the defendant, nevertheless, shall provide such insurance for the benefit of the plaintiff. The provision of such insurance coverage shall be in the nature of spousal support, but shall not be deductible to the defendant nor taxable to the plaintiff for income tax purposes.
3. No other alimony is awarded to either party, except for short-term alimony to the plaintiff until the transfer of the IRA monies, as noted herein.
4. The defendant shall retain sole ownership of the real property at 23 Gravel Street, Meriden, Connecticut.
5. The plaintiff shall retain sole ownership of the 1991 Cadillac DeVille and the 1992 Buick Regal automobiles. The defendant shall sign papers presented to him by the plaintiff to effectuate the transfer of ownership, if necessary.
6. The defendant shall retain sole ownership of the 1992 Oldsmobile, the 1997 Mitsubishi Galant, and the 2000 Dodge Neon automobiles.
7. The defendant shall retain sole ownership of the business known as Aresco Superette, together with all its inventory and its other assets and debts.
8. The plaintiff shall retain the Liberty Bank checking account; the defendant shall retain the First Union and Castle Bank checking accounts.
9. The defendant shall retain the Washington Mutual funds account.
10. The defendant shall retain the America Skandia life insurance policy on his own life.
11. The defendant shall receive sole ownership of 25 shares of Disney stock, the IBM stock, and the AOL stock; the plaintiff shall receive sole ownership of the Datek Online account and 30 shares of Disney stock. Each shall cooperate in the transfer of any interest necessary to effectuate this order. It shall be the responsibility of the defendant to arrange for the transfers of title within 30 days of CT Page 3300 this dissolution of marriage.
12. The defendant shall receive the entire tax refund of $4,686.38 now held in the trustee account of Attorney Morasutti.
13. The defendant shall receive $5,000 of the net proceeds from the sale of the marital residence now in the hands of Attorney Gerber; the plaintiff shall receive the balance of those funds in the amount of $17,650.74.
14. The plaintiff shall establish an Individual Retirement Account in her own name forthwith. As requested by the plaintiff, in lieu of any award of additional alimony, the defendant shall immediately cause to be transferred to the administrator of the plaintiff's IRA all the value of his IRA. Until the transfer of the IRA monies and the Datek stock interest is completed by the defendant, the defendant shall pay alimony to the plaintiff beginning March 18, 2002, in the amount of $100 per week. The plaintiff shall pay her own car insurance costs from this date forward.
15. The defendant shall retain his American Skandia Xtra Credit annuity. The plaintiff shall have no claim or interest in that annuity, as survivor, beneficiary or otherwise.
16. The plaintiff removed or lost certain items of tangible personal property from the marital home pendente lite, in violation of the orders of the court. The defendant was ordered by Judge Levine to pay $20 per week to the plaintiff for car insurance payments. He chose to pay only $16.83 per week to the plaintiff, in violation of the orders of the court. The actions of each party was contemptuous as to the court's orders. Each party shall be entitled to retain all items of tangible personal property now in his or her own possession and control.
17. The plaintiff shall be solely responsible for the following debts showing on her financial affidavit and shall indemnify and save the defendant harmless as to these debts:
a. Chase credit card
b. AmEx credit card
c. Bank of America credit card
d. Assorted utility, telephone and house maintenance bills CT Page 3301
 e. Her legal costs for this action (less $8,500 to be paid by the defendant)
18. The defendant shall be solely responsible for the following debts showing on his financial affidavit and shall indemnify and save the plaintiff harmless as to these debts:
a. MBNA credit card
b. His legal costs for this action
19. The defendant shall pay directly to the plaintiff's attorney in this action the sum of $8,500 towards attorney's fees. This payment is deemed necessary by the court so as to avoid undercutting the equitable division of assets as provided in these orders. Payment shall be made on or before May 15, 2002.
20. The plaintiff is permanently restrained from entering upon the premises at 23 Gravel Street, Meriden — Aresco Superette and is restrained from entering upon the premises of any residence occupied by the defendant.
21. The defendant is permanently restrained from following, harassing or threatening the plaintiff, and is restrained from entering upon the premises of any residence occupied by the plaintiff.
Winslow, J.